UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**MANPOWER INC.,**
        Plaintiff,

v.                                     Case No. 08C0085

**INSURANCE COMPANY OF**
**THE STATE OF PENNSYLVANIA,**
        Defendant.

---

## DECISION AND ORDER

Plaintiff Manpower Inc. ("Manpower") brings this action against its insurer, the Insurance Company of the State of Pennsylvania ("ISOP"), seeking reimbursement for losses arising out of the collapse of part of an office building and claiming that ISOP denied coverage in bad faith. ISOP counterclaims, seeking a declaration that it has already satisfied its coverage obligation. I have subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Manpower is a Wisconsin corporation having its principal place of business in Wisconsin, ISOP is a Pennsylvania corporation having its principal place of business in New York, and the amount in controversy exceeds $75,000.

Pursuant to the parties' request, I bifurcated the coverage and bad faith issues for purposes of discovery and motion practice. Before me now are the parties' cross-motions for summary judgment regarding coverage.

### I. BACKGROUND

On June 15, 2006, a portion of an office building located in Paris, France collapsed. Because the building's structure is important to this case, I will describe it in detail.

Between 2001 and 2003, the building's owner built a modern structure in between two historical buildings, as depicted in Figure 1.[1]



**Figure 1 - Building Plan**

Figure 1 labels the two historical buildings as the "18th Century Provence Building" and the "Rue de la Victoire Building," and labels the modern structure the "2001/2003 Building Structure." The division of the plan into "Building A" and "Building B" refers to the fact that each half of the 2001/2003 Structure was built so that its floors were level with the floors of the historical building next to it, as illustrated in Figure 2. However, there is no structural

---

[1] I have taken the figures used in this Decision and Order from ISOP's expert's report (see Weinstein Aff. Ex. 36) and use them for illustrative purposes only.



**Figure 2 - Cross Section**

separation between the Building-A and Building-B portions of the 2001/2003 Structure.

At the time of the collapse, Manpower's subsidiary, Right Management ("Right"), was a tenant, occupying portions of the first through fourth floors of the building and forty-five parking spaces in the garage. The collapse occurred when a portion of the slab of the garden courtyard in the Building-B area of the 2001/2003 Structure fell onto the parking garage beneath it. Although the garage and courtyard were badly damaged, the collapse did not cause any noticeable damage to Right's private office space. However, the day after the collapse, the Parisian Department of Public Safety noted that "there exists a serious and immediate risk for the safety of the occupants as long as the stability and solidity of the infrastructures are no longer ensured" and prohibited occupation of the entire building until further order. (Pl.'s PFOF Ex. 23.) In subsequent orders, the Department of

3

Public Safety continued to prohibit occupancy, noting that repair work to strengthen the building's infrastructure had not been completed. As a result of the collapse and the orders of the Department of Public Safety, Right was unable to occupy its offices for a substantial period of time, and eventually, it relocated. However, it lost income and incurred expenses as the result of the interruption of its business.

As a Manpower subsidiary, Right is an insured under a policy issued by ISOP that included a business interruption provision covering up to $15 million of lost income caused by loss or damage to covered property. Following the collapse, Manpower submitted a claim seeking more than €8 million (roughly $12 million, based on current exchange rates) for business interruption losses, loss of improvements and betterments, and loss of business personal property. However, ISOP determined that the only coverage triggered by the collapse was "civil authorities" coverage – i.e., coverage that applies when access to property is prohibited by order of a civil authority, such as the Parisian Department of Public Safety.[2] Because a $500,000 sublimit applied to civil authorities coverage under the policy, ISOP refused to pay Manpower more than $500,000. This lawsuit ensued.

---

[2]Civil authorities coverage is intended to extend business interruption coverage to situations in which a covered peril does not cause any loss or damage to the insured's property but instead causes a civil authority to issue an order prohibiting access to the insured's property. A typical example is where a municipality issues an evacuation order in response to a hurricane. The evacuation order will prohibit access to the insured's business and therefore cause a business interruption even though the hurricane itself caused no damage to the insured's property. See Magee v. Nat'l Fire Ins. Co., No. 2007 CA 0474, 2008 WL 426285 (La. Ct. App. Feb. 8, 2008) (discussing civil authorities coverage triggered by Hurricane Katrina).

## II. DISCUSSION

Summary judgment is required "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The parties agree that Wisconsin substantive law governs this action. See Tanner v. Jupiter Realty Corp., 433 F.3d 913, 915 (7th Cir. 2006) (district court sitting in diversity applies substantive law that would be applied by court of forum state). Under Wisconsin law, the same rules of construction that govern other contracts apply to insurance policies. J.G. v. Wangard, 313 Wis. 2d 329, 341 (2008). Language in a policy is to be given its plain and ordinary meaning, and if the language is unambiguous, the court does not resort to extrinsic evidence. Goldstein v. Lindner, 254 Wis. 2d 673, 681 (Ct. App. 2002). In the present case, neither party contends that the relevant policy language is ambiguous, and therefore I do not consider extrinsic evidence.

The policy issued to Manpower contained an "all risk" clause that covered "all risk of direct physical loss of or damage to property described herein except as hereinafter excluded." (Policy § 10.)[3] The parties agree that the collapse was not an excluded occurrence. The "property described herein" included "[t]he interest of all real and personal property (including improvements and betterments) owned, used, or intended for use by the Insured." (Policy § 9.A.) The business interruption provision covered "[l]oss resulting from necessary interruption of/or interference with business conducted by the Insured and caused by loss, damage, or destruction by any of the perils covered herein during the term

---

[3]The policy is attached as Exhibit C to Plaintiff's Proposed Findings of Fact.

5

of this policy to real or personal property as covered by this policy." (Policy § 9.B.) Section 9 of the policy contained additional provisions applicable to business interruption coverage, including the civil authorities provision, which provided as follows:

> <u>Interruption by Civil or Military Authority</u>: This policy is extended to cover the loss sustained during the period of time, not to exceed thirty (30) consecutive days, when, as a direct result of loss or damage by a peril insured against, access to real or personal property is prohibited by order of civil or military authority.

(Policy § 9.I(5).) The parties agree that this provision was an extension of, not a restriction on, business interruption coverage, and thus that the fact that a loss might have fallen within the civil authorities provision did not preclude ordinary business interruption coverage. As noted, however, the policy contained a $500,000 sublimit on civil authorities coverage, while the limit on general business interruption coverage was $15 million.

ISOP argues that because the collapse damaged only the area of the building around the courtyard and parking structure and not Right's leased office space, it did not cause "direct physical loss . . . or damage to" Right's "interest" in the building. Therefore, argues ISOP, ordinary business interruption coverage did not apply, and the only coverage available was the civil authorities coverage, which was triggered by the Department of Public Safety's order prohibiting occupancy of the entire building.[4]

---

[4]Although the parties frame the issue in terms of whether Manpower had an "insurable interest" in the building, I will not use this term, inasmuch as the dispositive issue is whether ISOP's policy covered the loss – that is, whether Manpower had, in fact, purchased insurance covering its interest in the building. Considerations relating to an insurable interest are relevant only when there is some indication that the policy represents a form of gambling or wagering – for example, when a person who has no interest in a property takes out insurance on that property. <u>See, e.g.</u>, <u>Ben-Hur Mfg. Co. v. Firemen's Ins. Co.</u>, 18 Wis. 2d 259, 262 (1962); <u>see also</u> <u>Prince v. Royal Indem. Co.</u>, 541 F.2d 646, 649 (7th Cir. 1976). Here, there is no question that Manpower's insuring its interest in the building was not a form of gambling or wagering, and that therefore it had an insurable

6

ISOP's argument assumes that Right's interest in the building was limited to that portion reserved for its exclusive use. But Right could not use its offices unless other parts of the building functioned properly. Such parts include the entrances and exits, hallways, elevators, staircases, heating and cooling systems, electricity, water, fire and security systems, and most importantly, the building's foundation and support structure. That Right did not enjoy the exclusive use of the above features does not mean that a business interruption caused by damage to them was not covered. The policy covered business interruptions resulting from damage to Right's interest in property it owned, used or intended to use. (Policy § 9.A.) A tenant "uses" the support structure of a building as much as it uses its own office space. Indeed, without the support structure, Right could not have operated in its leased space.[5] A tenant also uses other common aspects of an office building, such as electricity, water, and heating and cooling systems, although perhaps to a lesser extent than the support structure. Thus, if a covered peril damaged any of these features of the building, and the damage caused Right to sustain a business interruption loss, the policy would cover such loss up to $15 million, and resort to the civil authorities extension would be unnecessary.

---

interest in the portions of the building necessary to the continued use of its office space. See, e.g., Stebane Nash Co. v. Campbellsport Mut. Ins. Co., 27 Wis. 2d 112, 119-20 (1965) ("A person has an insurable interest in property when the relationship between him and the property is such that he has a reasonable expectation, based upon a real or legal right, of benefit to be derived from the continued existence of the property and of loss or liability from its destruction.").

[5]ISOP concedes that Right's interest as a tenant in the building extended as far as necessary to enable it "to continue operating in its leased space." (Mem. of Law in Opp. to Pl.'s Mot. for Partial Summ. J. at 12.)

7

In its reply brief, ISOP seems to concede that Right had an interest in the common elements of the building but argues that the collapse did not damage any common element necessary to the operation of Right's business. ISOP suggests that the building structure itself was not itself necessary to Right's business. But as just explained, Right used the structure during every second of its tenancy. Without the structure, there would have been neither offices nor a tenancy, and ISOP does not explain how, without it, Right could have continued its business in its offices.[6]

Perhaps ISOP's argument is that the collapse did not sufficiently damage the support structure and that, contrary to the Department of Public Safety's order, Right's offices were habitable and in no danger of collapsing. Under this view, the Department should only have prohibited occupation of the part of the building rendered unstable by the collapse, and thus the Department's overbroad order, rather than damage resulting from the collapse, caused Right's business interruption losses.

However, the evidence establishes that the collapse rendered the entire 2001/2003 Building Structure unstable,[7] at least for a period of eight to ten weeks following the

---

[6]ISOP concedes that all tenants "in an esoteric sense" use the buildings and common areas in which they lease space but then contends that the policy somehow excludes uses that can be described as esoteric. (Mem. of Law in Opp. to Pl.'s Mot. for Partial Summ. J. at 13.) However, there is nothing esoteric about the use of these common elements. If the support structure and other common elements did not exist, neither would the tenancy. Right therefore used the support structure and common areas as it did its private offices.

[7]ISOP suggests that instability is insufficient to trigger coverage and that the foundations in the area of Right's offices would have had to collapse or sustain visible damage before Right could claim business interruption losses as a result of damage to the building's support structure. However, the location of damage to the foundation does not matter, so long as the damage renders the entire structure unstable. A tenant cannot use an unstable support structure no matter where the physical damage to the building occurs.

8

collapse. ISOP's own engineering expert opines that it would have taken at least that long to complete certain "temporary strutting and propping works," which would have been required "to ensure the stability of the building (both damaged and undamaged sections) and to re-establish safe means of access and egress to the undamaged areas." (Weinstein Aff. Ex. 36, at p. 22 of 22.) In other words, the expert concludes that the collapse rendered the entire building ("both damaged and undamaged sections") uninhabitable for a period of at least eight to ten weeks following the collapse due to damage to the support structure and entrances and exits. ISOP's expert also concludes that the collapse damaged other common elements of the building necessary to the operation of Right's business, including the fire escapes and plumbing and electrical services. (Weinstein Aff. Ex. 36, at p. 20-21.)

ISOP's only evidence in support of its position that Right could have continued to use its offices are the statements of several lay witnesses who observed that Right's offices were not damaged. Again, however, even if the offices were not damaged, they were unusable because of damage to the building's support structure and other common features. Further, none of ISOP's witnesses has engineering or related expertise, and

---

For example, if a building is supported by four beams and one of them is damaged, the entire building is placed in jeopardy. A tenant cannot use its office space even if such space is not close to the damaged beam. In such a case, the tenant will have sustained damage to its property interest in the building, and that damage will not have been caused by a subsequent evacuation order. See Hampton Foods, Inc. v. Aetna Cas. & Sur. Co., 787 F.2d 349, 353 (8th Cir. 1986) ("[O]ne would reasonably expect that if a building was severely damaged by a windstorm or snowstorm, rendering its collapse imminent and making access to the building extremely dangerous, this would constitute a loss [to a tenant] not due to a subsequent condemnation of the structure."); Throgs Neck Bagels, Inc. v. GA Ins. Co., 671 N.Y.S.2d 66, 71 (N.Y. App. Div. 1998) ("It cannot logically be claimed that [a tenant] would not have vacated a building rendered structurally unsound but for an order from the Department of Buildings.").

9

therefore their statements about damage to the building structure lack foundation. The only witnesses who could render competent opinions on that issue (the parties' engineering experts) conclude that the collapse did render the building unstable. Therefore, the record establishes that the collapse prevented Right from using its offices, at least until certain temporary repairs were completed. Accordingly, Manpower is entitled to reimbursement for any business interruption losses it sustained between the collapse and the time the necessary repairs could have been, or were, completed, up to $15 million.[8] Because coverage was available under the ordinary business interruption provisions of the policy, and the orders of the Department of Public Safety merely confirmed that the collapse rendered the entire building unstable, the $500,000 sublimit on civil authorities coverage does not apply. See Throgs Neck Bagels, Inc., 671 N.Y.S.2d at 70-71 (holding that where fire rendered retail complex unsafe and Department of Buildings ordered evacuation of entire complex, fire was cause of loss to lessee of retail space not destroyed by fire, rather than order of civil authority, and thus civil authorities exclusion did not apply); Nationwide Mut. Ins. Co. v. Rhee, 287 S.E.2d 257, 260-61 (Ga. Ct. App. 1981) (holding that where building leased by insured suffered extensive structural damage from fire and was subsequently demolished pursuant to a condemnation order, insured's loss of property during demolition was caused by fire, not condemnation order, and thus civil authorities exclusion did not apply); 10A Lee R. Russ & Thomas F. Segalla, Couch on Insurace

---

[8]The record suggests that although the temporary repairs could have been completed in eight to ten weeks, they were not actually completed until two years after the collapse. ISOP's policy limits business interruption coverage to the time period required to repair the damage "with the exercise of due diligence and dispatch." (Policy § 9.I(1)(a).) The parties have not addressed this provision and therefore I express no view on whether it limits Manpower's business interruption coverage.

10

§ 152:26 (3d ed. 1995) ("Generally, courts have found [a civil authorities exclusion] applicable where losses are solely the result of a civil condemnation order, and inapplicable where losses are caused by extraneous forces which result in a condemnation order.").

It follows from the analysis above that any extra expenses which Manpower incurred as a result of the collapse were covered by the policy's "extra expense" provision, which applied to "Extra Expense reasonably and necessarily incurred resulting from loss, damage, or destruction to property by any of the perils covered herein." (Policy § 9.D(1).) The policy defined extra expense as "the excess of the total cost during the period of restoration of the damaged property chargeable to the operation of the Insured's business over and above the total cost that would normally have been incurred to conduct the business during the same period had no loss or damage occurred." (Policy § 9.D(2).) As explained, the collapse caused "loss, damage or destruction" to Manpower's interest in covered property, and thus Manpower is entitled to reimbursement for extra expenses it reasonably and necessarily incurred while operating its business after the collapse. These include expenses incurred to replace the furniture, equipment, and other business personal property that Right could not retrieve from its offices after the collapse, as well as any improvements and betterments (such as interior walls, doors and the like) that Right needed to replace in order to continue its business.[9]

---

[9]As with business interruption coverage, extra expense coverage was limited to the time period needed to repair the building using due diligence and dispatch. (Policy § 9.I(1)(a).) Thus, if the repairs took unreasonably long to complete, Manpower's damages may be limited. Further, Manpower may not be entitled to the full replacement cost of its inaccessible furniture and other items, but only to the rental or prorated value of the replacement property over the time period reasonably needed to repair the building. Again,

11

The final question is whether Manpower is entitled to claim the value of Right's inaccessible business personal property and improvements and betterments as a loss under the policy's real and personal property provision. As noted, this provision covered the "interest" in "real and personal property (including improvements and betterments) owned, used, or intended for use by the Insured." (Policy § 9.A(1).) Right undisputedly had an interest in its business personal property and improvements and betterments. The question is whether it suffered a loss within the meaning of the all-risk provision, which covered "all risk of direct physical loss of or damage to" covered property. (Policy § 10.) Manpower contends that the collapse rendered its property physically inaccessible and therefore resulted in a "direct physical loss" of such property. ISOP contends that Manpower did not sustain a covered loss because the collapse did not physically damage, move or alter the property in any way.

As an initial matter, I reject ISOP's argument that a peril must physically damage property in order to cause a covered loss. As noted, the policy covered physical losses in addition to physical damage, and if a physical loss could not occur without physical damage, then the policy would contain surplus language. However, a contract must, where possible, be interpreted so as to give reasonable meaning to each provision without rendering any portion superfluous. See, e.g., Dewitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship, 273 Wis. 2d 577, 597 (2004). Thus, "direct physical loss" must mean something other than "direct physical damage." Indeed, if "direct physical loss" required physical damage, the policy would not cover theft, since one can steal property

---

I leave the resolution of these matters to further proceedings relating to Manpower's damages.

12

without physically damaging it. And ISOP does not contend that the policy did not cover theft. Similarly, I reject ISOP's argument based on the valuation provisions of the policy, which contained provisions for valuing "property which has been damaged or destroyed by an insured peril" but not for property that has not been damaged or destroyed. (Policy § 13.A.) ISOP argues that this omission is a reflection of the fact that the policy did not cover property that was not damaged or destroyed. Again, however, this interpretation would mean that the policy did not cover theft.

ISOP next cites non-Wisconsin cases interpreting "direct physical loss." See Pentair, Inc. v. Am. Guar. & Liab. Ins. Co., 400 F.3d 613 (8th Cir. 2005); Royal Indem. Ins. Co. v. Mikob Props., Inc., 940 F. Supp. 155 (S.D. Tex. 1996); Cargill, Inc. v. Appalachian Ins. Co., No. 4-77-238, 1983 U.S. Dist. LEXIS 20156 (D. Minn. 1996); Roundabout Theatre Co., Inc. v. Cont'l Cas. Co., 751 N.Y.S.2d 4 (N.Y. App. Div. 2002). However, I am not bound by these cases, and I do not find them instructive. They interpret the term in the context of business interruption and forms of coverage other than real and personal property coverage, and their facts are distinguishable.

The most factually similar case is Hampton Foods, Inc. v. Aetna Casualty & Surety Co., 787 F.2d 349 (8th Cir. 1986), in which a grocery store rented space in a building and had insurance covering "loss or damage . . . resulting from all risks of direct physical loss." Id. at 351. Windload and snowload caused the building to become unstable, and the city building inspector determined that it was at risk of imminent collapse and ordered its evacuation. Before the evacuation order took effect, the insured removed much of its inventory from the building and sold it at salvage value. Because salvage value was

13

substantially less than market value, the sale resulted in a loss to the insured. In addition, the insured did not remove its business equipment from the building, and the equipment was later destroyed when the building was demolished without notice to the insured. The insurer denied coverage for both the realized economic loss on the inventory and the demolished business equipment on the ground that there was no "direct physical loss" to the property. Id. The court held that both the realized economic loss and the destruction of equipment constituted direct physical losses, reasoning that the insured suffered "direct, concrete and immediate loss due to extraneous physical damage to the building."[10] The same is true in the present case. Right sustained a direct, concrete and immediate loss of its business personal property and improvements and betterments due to physical damage to its office building.

Further, the plain language of the all-risk clause establishes that the clause applies to the loss of Right's business personal property and improvements and betterments. Right suffered a "loss" of its interest in this property when the collapse prevented it from using the property for its intended purposes. Cf. Coniston Corp. v. Vill. of Hoffman Estates, 844 F.2d 461, 465-66 (7th Cir. 1988) (bundle of rights that together constitute property ownership includes the owner's interest in being able to put property to its most valuable use). This loss was "physical," in that it was caused by a physical event – the collapse – which created a physical barrier between the insured and its property. It was not an "intangible" or "incorporeal" loss. See 10A Couch on Insurance, supra, § 148:46 (noting

---

[10]As indicated supra, note 7, the court also held that the wind and snowload damage to the building caused the loss, not the subsequent condemnation order issued by the building inspector.

14

that losses that are intangible or incorporeal are often considered nonphysical). The loss was also "direct." In the context of a property insurance policy, the word "direct" indicates that the policy covers only losses and damage proximately caused by a covered peril – that is, it means that the policy does not cover remote losses. Farmers Mut. Fire Ins. Co. v. F.E. McMillan, 395 S.W.2d 798, 799 (Tenn. 1965) (noting that "direct" is synonymous with "proximate cause"); 10A Couch on Insurance, supra, § 148:60 ("[T]he word 'direct' means merely 'immediate' or 'proximate' as distinguished from 'remote.'"). In the present case, the collapse was the proximate cause of Right's loss of its interest in its property. As explained above, although the order of the Department of Public Safety was also a cause of this loss, that order simply recognized that the collapse had rendered the entire building uninhabitable and Right's property inaccessible. The collapse was not remote from the loss, and thus the loss was direct.

I recognize that terms such as "physical," "nonphysical," "direct," "proximate cause," and "remote" are imprecise. Although policies include these terms in order to ensure that coverage does not extend farther than the insurer contemplated when it issued the policy or the insured contemplated when it purchased the policy, the terms do not precisely identify the place to draw the line. However, in the present case, it cannot seriously be contended that the collapse was so far separated from the loss of Right's interest in personal property that the loss falls on the remote side of the line and represents a risk that ISOP did not contemplate insuring. The building in which Right leased office space and in which it kept a substantial amount of covered property sustained severe physical damage as a result of a covered peril. A reasonable insured in Right's position would believe that its property insurance would cover all ensuing losses unless they fell within a specific

15

exclusion. See RTE Corp. v. Maryland Cas. Co., 74 Wis. 2d 614, 624 (1976) (policy must be construed in accordance with reasonable understanding of a person in the position of the insured). Accordingly, Manpower is entitled to coverage for its loss of Right's business personal property and improvements and betterments.[11]

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Manpower's motion for partial summary judgment is **GRANTED** and ISOP's motion for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that ISOP's motion to file a sur-reply and to strike plaintiff's supplemental proposed findings of fact is **GRANTED IN PART** and **DENIED IN PART**. The motion to strike is denied, but ISOP's request to file a sur-reply and a response to the supplemental proposed findings of fact is granted.

---

[11]As with business interruption and extra expense coverage, issues remain regarding the calculation of Manpower's damages. However, unlike in the case of those coverages, the issues here do not relate to the period of recovery provision (Policy § 9.I(1)(a)), since that provision applied only to business interruption, extra expense, and other coverages not relevant here and not to real and personal property coverage. Instead, the issue is how to calculate damages in light of the fact that the property is undamaged and probably will be recovered. When recovered, some of the property might have value, and such value may need to be deducted from Manpower's damages. Alternatively, ISOP may simply treat the property as if it were destroyed but then retain the right to any value that can be realized when the property is recovered. This is similar to coverage for theft, since in the case of theft there is usually a possibility that the property will be recovered. 10A Couch on Insurance, supra, § 151:4. Further, although the period of recovery provision does not apply, the record indicates that litigation in France has severely delayed the repair process, and thus the litigation rather than the collapse may have caused some of Right's loss of access to its personal property. This litigation might be a "remote" and/or "nonphysical" loss, rather than a direct physical loss, and therefore Manpower's real and personal property coverage may be limited to the equivalent of extra expense coverage – i.e., the value of the property prorated over the period of time it would have taken to repair the building under ordinary circumstances. Again, however, I leave these matters for further development.

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held on November 19, 2009 at 1:30 p.m. CST to schedule further proceedings. The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 3 day of November 2009.

/s_____
LYNN ADELMAN
District Judge