# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MANPOWER INC.,**
                    **Plaintiff,**

              **v.**                                   **Case No.  08C0085**

**INSURANCE COMPANY OF**
**THE STATE OF PENNSYLVANIA,**
                    **Defendant.**

---

## DECISION AND ORDER

Plaintiff Manpower Inc. ("Manpower") brings this action against its insurer, the Insurance Company of the State of Pennsylvania ("ISOP"), seeking reimbursement for losses arising out of the collapse of an office building in which Manpower's French subsidiary maintained its offices.  Before me now is ISOP's motion in limine regarding the admissibility of expert testimony by Manpower's forensic accountant, Eric Sullivan, under Federal Rule of Evidence 702.

## I.  BACKGROUND

On June 15, 2006, a portion of an office building located in Paris, France collapsed.  At the time of the collapse, Manpower's subsidiary, Right Management ("Right"), maintained offices in the building.  The collapse rendered Right's offices uninhabitable for an extended period, and eventually it relocated to new offices.  As a Manpower subsidiary, Right was insured for up to $15 million under an "all risk" policy issued by ISOP.  The policy included a business-interruption provision that covered lost profits during the period in which Right could not conduct business at the insured premises.  The policy also contained

an extra-expense provision covering any extra expenses incurred by Right as a result of the collapse.

Following the collapse, Manpower submitted a claim seeking more than €8 million in coverage under the policy. However, ISOP determined that a $500,000 sublimit applied to Manpower's claim and refused to pay more than that amount. In a prior order, I determined that the $500,000 sublimit did not apply and that Manpower was entitled to coverage up to the $15 million policy limit.

In order to prove the amount of its loss, Manpower retained a forensic accountant, Eric Sullivan, who opines that the collapse caused a business-interruption loss of €5,125,830 and extra expenses in the amount of €2,377,746, for a total loss of €7,503,576. ISOP moves to exclude this expert testimony under Federal Rule of Evidence 702.

## II. DISCUSSION

Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

See also Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). Manpower offers Sullivan's testimony in order to establish its losses under both the business-interruption and extra-expense provisions of the policy. However, ISOP's motion in limine discusses only Sullivan's opinions regarding the business-interruption loss, and so I do not consider whether Sullivan's opinions as to

extra-expense coverage are admissible. Regarding Sullivan's opinions on Manpower's business-interruption loss, ISOP argues that they are inadmissible because they are not the product of reliable principles and methods.

The policy specifies that Manpower's business-interruption loss must be calculated by taking the net profits lost because of the interruption and adding any charges and expenses that must be paid during the interruption period to the extent that those charges and expenses would have been paid had no loss occurred. (The parties refer to expenses that must be paid during the interruption period even though the insured is no longer operating as "continuing expenses." The parties refer to expenses that the insured saved due to the fact that it was not operating during the interruption period as "non-continuing expenses.") The policy also states that, in making these calculations, "due consideration shall be given to the experience of the business before the date of damage or destruction and to the probable experience thereafter had no loss occurred." (Policy § 9.B(5).)

Sullivan calculated Manpower's loss by first forecasting the amount of revenues that Right would have generated had the collapse not occurred and subtracting the revenues that Right actually generated during the interruption period to come up with a figure for lost revenues. Sullivan then projected the total expenses that Right would have incurred had the collapse not occurred and subtracted Right's actual continuing expenses from this amount to come up with a figure for non-continuing expenses saved as a result of the collapse. He then deducted non-continuing expenses from lost revenues to arrive at the amount of Manpower's loss expressed in terms of net profit lost plus continuing expenses.[1]

---

[1]Sullivan expresses the loss in terms of lost revenues less non-continuing expenses, whereas the policy specifies that the loss is to be measured by taking net profits lost and

3

Sullivan's calculations are thus straightforward. However, whether these calculations produce a reliable measurement of Manpower's loss turns on whether Sullivan used reliable methods when selecting the numbers used in his calculations – specifically, projected total revenues and projected total expenses.

In projecting total revenues, Sullivan used a method involving basic growth-rate extrapolation, which one treatise describes as "the simplest and most frequently used revenue forecasting method." Patrick A. Gaughan, <u>Measuring Business Interruption Losses and Other Commercial Damages</u> 145 (2004). Under this method, the expert first determines an appropriate revenue base. He or she then selects a growth rate and applies it to the chosen revenue base to project "but for" revenues. <u>Id.</u> In the present case, Sullivan used the five-month period preceding the collapse (January to May 2006) as a base period. To arrive at a growth rate, he compared the total revenues from this period to the same period in 2005, which showed that revenues were 7.76% higher during the five-month period in 2006 than during the same period in 2005. Sullivan assumed that this 7.76% growth rate would have applied throughout the fourteen-month interruption period had the collapse not occurred. He then used this growth rate to extrapolate lost revenues for the interruption period.

The heart of ISOP's challenge to Sullivan's methods involves his selection of the 7.76% growth rate. ISOP points out that Right's average annual growth rate from 2003 to 2006 was –4.79% and argues that Sullivan should have taken this into account when

adding continuing expenses. However, these are just different ways of describing the same number. Net profit is total revenues less total expenses (i.e., continuing expenses plus non-continuing expenses), and thus by subtracting only non-continuing expenses from total revenues one is left with net profit plus continuing expenses. (Sullivan Aff. ¶¶ 14-16.)

selecting a growth rate.  ISOP also points to other, lower growth rates that Sullivan could have used had he not confined his analysis to the five months immediately preceding the collapse, such as the 3.8% growth rate for the period January 2005 to May 2006.  At his deposition, Sullivan explained that he decided to use the 7.76% growth rate rather than growth rates computed using longer periods because Manpower had recently acquired Right and installed new managers and policies in an effort to turn the company around. (Sullivan Dep. at 187.)  After speaking with Right's new managers, Sullivan concluded that by the end of 2005 these managers had, in fact, succeeded in turning the company around, and thus he decided to use the growth that the company exhibited in the first five months of 2006 when calculating the expected growth rate for the interruption period. (Sullivan Dep. at 185.)

Here is where Sullivan's analysis breaks down.  The choice of growth rate is one of the most important parts of the business-interruption calculation, and it appears that Sullivan did little more than assume that the growth that Right had experienced during the five months before the collapse was the result of new management and thus would continue unabated for the next fourteen months.  But Sullivan is not an expert on business management, and thus Sullivan's conversations with Right's managers cannot be considered a reliable basis for a revenue forecast.  Further, Sullivan did no economic analysis of the various factors affecting Right's revenues and did not make any effort to determine whether the growth that Right experienced in the first five months of 2005 was the result of factors other than new management.  For all Sullivan's analysis reveals, Right's growth may have been the result of industry conditions that did not last throughout the interruption period, or it may have been simply an aberration.  In order to offer an

opinion as to whether the growth experienced in the five months preceding the collapse would have continued throughout the interruption period, an expert would need to do a more thorough analysis in an effort to control for the various factors affecting Right's growth.

Manpower argues that Sullivan's choice of growth rate was a factual assumption, and that it is for the trier of fact to determine whether to accept this assumption as true after hearing the testimony of Right's managers about their efforts to improve Right's business. But an ordinary trier of fact lacks the expertise necessary to judge how the actions of Right's managers impacted the company's growth. I assume Right's new managers plan testify about the changes they made, and that Manpower will ask the trier of fact to infer that these changes caused the higher growth that Right experienced during the first five months of 2006.[2] But absent competent expert testimony, the trier of fact could only speculate as to whether there was any causal connection between the managers' actions and the increased growth, and thus expert testimony is needed on this issue. See Simonson v. Hepp, 549 F.3d 1101, 1106-07 (7th Cir. 2008) (expert testimony is required when needed to avoid speculation on a technical issue); Cramer v. Theda Clark Mem'l Hosp., 45 Wis. 2d 147, 151-52 (1969) (same). Again, an expert would have to do at least some analysis of the various factors affecting Right's growth rate to determine whether Right could expect the growth experienced during the first five months of 2006 to continue throughout the interruption period.

---

[2]Manpower has not cited to any depositions or affidavits of its managers, and so I cannot precisely describe their proposed testimony.

I add that had Sullivan not chosen such a short base period for calculating lost revenues, I might have found his analysis reliable. Sullivan had historical data going back to 2003, and this historical data showed a declining trend in Right's monthly revenues. When a business has a long track record, revenues can be forecasted with greater certainty, and the need to perform a finely calibrated analysis of the various factors affecting revenues may not be as acute. See Gaughan, supra, at 145-46. But in ignoring Right's long-term track record and focusing instead on the five months immediately preceding the collapse, Sullivan essentially treated Right as a new business. And projecting lost revenues for a new business is notoriously difficult precisely because the business lacks a track record. See MindGames, Inc. v. Western Publ'g Co., Inc., 218 F.3d 652, 658 (7th Cir. 2000); Gaughan, supra, at 171. In order to compensate for the lack of a track record, the expert must look to other indicators, such as the track records of other firms that are comparable to the plaintiff. See T & HW Enters. v. Kenosha Assocs., 206 Wis. 2d 591, 604-05 & n.6 (Ct. App. 1996); Gaughan, supra, at 171. But Sullivan did not examine any such indicators with respect to Right, nor did he perform any kind of sensibility check on his projection to determine whether his projection was reasonable in light of the experience of other firms during the interruption period. See Gaughan, supra, at 169-70 (stating that experts should perform sensibility checks on forecasts to ensure they are within a reasonable range). Instead, Sullivan merely assumed that the trend in revenues experienced in the first months of 2006 would continue because Right was under new management. Thus, I cannot say that Sullivan's revenue projection was based on reliable principles or methods.

ISOP also argues that Sullivan's projection of Right's total expenses for the interruption period is unreliable. But because Sullivan's failure to show that his revenue projection is reliable is fatal to the admissibility of his business-interruption calculation, I do not consider whether his total-expense projection is also unreliable.

Accordingly, I conclude that Sullivan's opinions as to Manpower's business-interruption losses are not the product of reliable principles and methods. However, because ISOP has not challenged Sullivan's opinions concerning Manpower's extra-expense losses, I express no opinion as to whether those opinions are admissible.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that ISOP's motion in limine to exclude the testimony of Eric Sullivan is **GRANTED** to the extent that it seeks exclusion of Sullivan's opinions regarding Manpower's business-interruption loss.

Dated at Milwaukee, Wisconsin, this 20 day of September, 2010.

/s_____
LYNN ADELMAN
District Judge