# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MANPOWER INC.,**
        Plaintiff,

v.                                            Case No. 08-C-0085

**INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA,**
        Defendant.

---

## DECISION AND ORDER

Plaintiff Manpower Inc. ("Manpower") brings this action against its insurer, the Insurance Company of the State of Pennsylvania ("ISOP"), seeking reimbursement for losses arising out of the collapse of an office building in which Manpower's French subsidiary maintained its offices. Before me now are the parties' motions for summary judgment on a number of issues. Manpower moves for summary judgment on ISOP's claim that Manpower committed misrepresentation and/or fraud, thereby voiding the policy. ISOP moves for summary judgment on Manpower's claim that ISOP committed the tort of insurance bad faith and on Manpower's claim for statutory prejudgment interest.

## I. BACKGROUND

On June 15, 2006, a portion of an office building located in Paris, France collapsed. At the time of the collapse, Manpower's subsidiary, Right Management ("Right"), leased office space in the building. The collapse rendered Right's offices uninhabitable for an extended period, and eventually it relocated to new offices. As a Manpower subsidiary, Right was insured for up to $15 million under a policy issued by ISOP. The policy included

a business-interruption provision that covered lost profits during the period in which Right could not conduct business at the insured premises. The policy also contained an extra-expense provision covering any extra expenses incurred by Right as a result of the collapse.

Following the collapse, Manpower submitted a claim seeking more than €8 million in coverage under the policy. However, ISOP determined that a $500,000 sublimit applied to Manpower's claim and refused to pay more than that amount. In a prior order, I determined that the $500,000 sublimit did not apply and that Manpower was entitled to coverage up to the $15 million policy limit. (See Nov. 3, 2009 Order [Docket #79].)

## II.  DISCUSSION

Summary judgment is required "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

### A.  ISOP's Misrepresentation Defense

ISOP's policy contains provisions stating that the policy is void if the insured makes misrepresentations or engages in fraud with respect to the policy or a loss under the policy. ISOP intends to argue at trial that Manpower overvalued the amount of its business-interruption loss to ISOP and that therefore the policy is void. Manpower moves for summary judgment on this defense.

To show that the policy is void because of fraud or misrepresentation, ISOP must prove the following three elements by clear and convincing evidence: (1) the insured made

2

a false statement; (2) the insured knew that the statement was false; and (3) in making the statement, the insured intended to deceive the insurer. Stebane Nash Co. v. Campbellsport Mut. Ins. Co., 27 Wis. 2d 112, 124 (1965); Gen. Star Indem. Co. v. Estate of Lake Geneva Sugar Shack, Inc., 215 Wis. 2d 104, 115 (Ct. App. 1997). Unlike a typical fraud claim, in order to show that the policy is void based on fraud or misrepresentation, ISOP need not prove that it relied on the misrepresentation or suffered damages as a result. Am. Cas. Co. v. B. Cianciolo, 987 F.2d 1302, 1303-04 (7th Cir. 1993); Stebane Nash, 27 Wis. 2d at 124.

In the present case, the alleged false statements consist of the business-interruption calculations made by two accounting experts retained by Manpower and Right. Right hired the first expert, Jacques Herr of HerrExperts, shortly after the collapse. ISOP contends that Right submitted Herr's initial report in February 2007 and that this report contained an inflated business-interruption calculation. However, ISOP has not produced a copy of this report or any evidence establishing the amount of the business-interruption loss stated in the report. Instead, ISOP cites a number of emails indicating that Herr or someone at Right erroneously sent ISOP a preliminary outline of Herr's analysis without the approval of the Manpower and Right executives in charge of the claim. Since this transmission was not approved by Right or Manpower, no reasonable trier of fact could conclude that Manpower intended to deceive ISOP with Herr's preliminary analysis. Therefore, this statement is not actionable.

The next alleged false statement is Herr's final report, which Manpower sent to ISOP on June 13, 2007. ISOP contends that although the business-interruption calculation in this report was lower than in Herr's preliminary analysis, it was still false

because it contained an inflated calculation of Right's gross margin rate. Gross margin rate (also known as gross profit margin) is calculated by dividing gross margin (i.e., sales minus cost of sales) by sales. See Joel G. Siegel & Jae K. Shim, Dictionary of Accounting Terms 217 (4th ed. 2005). In his report, Herr determined that Right's gross margin rate for the 2005 fiscal year was 64.1%, and he used this rate when calculating the amount of Right's loss over the course of the interruption period (June 2006 to December 2007). In calculating gross margin rate, Herr determined that Right's revenues from sales for fiscal year 2005 were €27,251,385 and that its cost of sales (listed under the heading "variable costs") was €9,777,831. These numbers support his gross margin rate calculation: (€27,251,385 - €9,777,831 / €27,251,385) x 100 = 64.1. Further, Herr's report explains how he arrived at his numbers for sales and variable costs. For sales, Herr used the sales revenues as reported on Right's tax return. Herr then itemized all of the costs he considered to be variable costs.

In order to show that Herr's gross margin rate was inflated, one would expect ISOP to show that Herr either falsely represented the amount of revenues from sales or the cost of sales, since these are the only variables in the gross margin rate calculation. However, ISOP makes no attempt to do this. Instead, it points to Right's profit and loss statements ("P&Ls") for various periods and argues that because the P&Ls show lower gross margin rates than Herr's report, Herr's rate must be inflated.[1] But Herr never stated the he relied on Right's P&Ls when calculating gross margin rate or that he calculated gross margin rate using the same method that Right used when generating its P&Ls. Rather, as noted, Herr

---

[1] ISOP's accountant, C. Lewis, used Right's P&Ls for the period January 2004 to May 2006 and determined that Right's gross margin rate was 39.4%.

used Right's tax returns to determine sales revenues and itemized the expenses he included as variable costs. Now, ISOP might argue that Herr should have consulted the P&Ls or that he should not have relied on Right's tax returns and should not have come up with his own list of variable costs, but these are challenges to Herr's method. And Herr fully disclosed his method in his report, so the fact that Right's P&Ls – which were calculated using a different method – show a different gross margin rate does not allow a reasonable trier of fact to conclude that Herr's report contained a false statement. See Gen. Star Indem. Co., 215 Wis. 2d at 116-18 (holding that where overvaluation of business-interruption loss was the result of auditor's choice of accounting assumptions, insured could not be considered to have committed fraud or misrepresentation).

Perhaps if ISOP could show that no honest accountant would have calculated gross margin rate using the data that Herr used, then ISOP could argue that Herr's report was nothing but a sham. But ISOP does not attempt to show this, and nothing in the record indicates that Herr calculated Right's gross margin rate in bad faith. There are some emails between Right executives suggesting that they considered Herr's calculation to be optimistic or aggressive. The record is not entirely clear on this point, but it appears that Herr may have taken an aggressively narrow view of what costs counted as variable costs. If ISOP could show that Herr's view was so aggressive that he omitted costs that no honest accountant would have omitted, then ISOP could argue that Herr's report contained a misleading omission. Again, however, ISOP does not attempt to make this showing, and thus on the present record no reasonable trier of fact could conclude that Herr's report was false or misleading.

The remaining alleged false statement was made by the forensic accountant that Manpower retained for purposes of this litigation, Eric Sullivan. In his report, Sullivan concluded that Manpower suffered a business-interruption loss of €5,125,830 during the period June 2006 to July 2007. ISOP argues that this calculation is inflated because Sullivan assumed that Right's revenues would grow by 7.76% over the interruption period even though the trend in Right's growth rate for a several-year period prior to the collapse was negative. Sullivan stated that he chose the 7.76% growth rate because that was Right's growth rate for the period January 2006 to May 2006. Sullivan explained that he chose to use the growth rate for this period rather than Right's long-term negative growth rate because Manpower had recently acquired Right and hired new managers who appeared to have increased the company's revenues.

ISOP does not argue that the factual assumptions underlying Sullivan's decision to use the 7.76% growth rate were false. That is, ISOP does not dispute that the growth rate for the period January to May 2006 was 7.76% or that Manpower had recently installed new managers at Right. Instead, ISOP argues that Sullivan should not have ignored Right's long-term history of negative growth and that he should have consulted other sources of information about Right's financial condition before settling on the 7.76% growth rate. But as was the case with Herr, these are challenges to Sullivan's methods, and Sullivan did not try to conceal his methods in an attempt to deceive ISOP. Rather, his methods were laid bare in his report and at his deposition. Nor has ISOP shown that Sullivan used methods that no honest accountant would have used.[2] Indeed, although

---

[2]In a prior order, I found that Manpower had failed to meet its burden under Federal Rule of Evidence 702 to show that Sullivan used reliable principles and methods when

ISOP's own accountant, C. Lewis, criticizes Sullivan's methods and states that these methods produced an "overexaggeration" of Manpower's loss (Lewis Decl. [Docket #109] ¶ 8), Lewis does not state that Sullivan's methods were dishonest. Thus, ISOP's attack on Sullivan's report comes down to a difference of opinion over the proper assumptions and methods to use when calculating business-interruption losses, and this difference of opinion cannot give rise to fraud under Wisconsin law. Gen. Star Indem. Co., 215 Wis. 2d at 117.

Accordingly, Manpower's motion for summary judgment as to ISOP's claim that the policy is void due to fraud or misrepresentation will be granted.

**B.      Manpower's Bad Faith Claim**

When ISOP began adjusting Manpower's claim, its coverage position was that the claim was limited to a $500,000 sublimit applicable to "civil authorities" coverage – i.e., coverage that applies when access to property is prohibited by order of a civil authority. ISOP took this position because the collapse did not physically damage the part of the building where Right's private offices were located. Rather, the collapse damaged part of the building's foundation, which then caused Parisian authorities to prohibit access to the entire building for safety reasons. Right leased its office space and did not own the building, and thus ISOP thought that the collapse did not cause "direct physical loss of or damage to" Right's property interest in the building, as required to trigger coverage up to the full policy limits. Instead, ISOP thought that Right's loss was caused by the order of

---

selecting Right's growth rate. (Sept. 20, 2010 Order [Docket #132].) However, the fact that Sullivan could not show that his methods were reliable for purposes of Rule 702 does not raise an inference that he employed fraudulent accounting methods.

the Parisian civil authorities, making civil-authorities coverage the only applicable coverage. However, for reasons explained in my order granting Manpower's motion for summary judgment on its claim for breach of contract (Nov. 3, 2009 Order [Docket #79]), I concluded that the physical damage to the building's foundation triggered coverage under the ordinary policy provisions and that therefore the $500,000 sublimit did not apply.

Manpower contends that in taking the position that coverage was limited to civil-authorities coverage, ISOP committed the tort of insurance bad faith. To prevail on a bad faith claim, the insured must show, among other elements, that the insurer did not have a reasonable basis for denying policy benefits – i.e., that the claim was not "fairly debatable." See, e.g., Trinity Evangelical Lutheran Church v. Tower Ins. Co., 261 Wis. 2d 333, 347 (2003). ISOP moves for summary judgment on this claim, arguing that its coverage position was based on a fairly debatable point of law. See Samuels Recycling Co. v. CNA Ins. Co., 223 Wis. 2d 233, 249 (Ct. App. 1998) (holding that bad faith claim will fail even if court determines that coverage existed where insurer's coverage position was based on fairly debatable point of law).

The point of law in question is whether physical damage to part of a building – but not the part containing the insured's leased space – that causes a civil authority to prohibit access to the insured's leased space, constitutes "direct physical loss of or damage to" the insured's interest in property. I answered this question in the affirmative, but the point was fairly debatable. I derived my conclusion from policy language stating that the policy's business-interruption provision was triggered by physical damage to property that Right "used," reasoning that Right used the building's foundation to the same extent that it used its private offices, since without the foundation the offices could not exist. However, no

8

published Wisconsin case had interpreted similar policy language in this fashion, and no published case from another jurisdiction provided a clear answer. Further, it is fairly debatable whether the term "use" in the policy was intended to apply to the building's foundation and other common areas, rather than parts of the building that the insured "used" more directly. In my view, the term applies to the foundation and common areas, but ISOP was free to take a contrary view without engaging in bad faith.

In opposing summary judgment, Manpower does not argue that ISOP's legal conclusion was not fairly debatable. Instead, it argues that ISOP knew that the collapse caused physical damage to the building and that it was bad faith for ISOP to contend that the building was undamaged. But as just explained, ISOP's denial of coverage was based on its legal conclusion that damage to the foundation did not constitute damage to Manpower's property interest in the building, not on a factual determination that the building was undamaged. Indeed, ISOP never disputed that the building itself was physically damaged.[3] And because ISOP's legal conclusion rested on a fairly debatable point of law, summary judgment is warranted on Manpower's bad faith claim.[4]

---

[3] I should note that ISOP has used somewhat imprecise language in its briefs and in the discovery materials. At times, it states that its coverage position was based on the fact that the collapse did not damage "the building." However, from the surrounding context, it is clear that ISOP uses "the building" as shorthand for "the part of the building in which Right's leased office space was located." Obviously, ISOP does not dispute that the collapse damaged the part of the building that actually collapsed – i.e., the courtyard and parking structure. The dispute was over whether damage to those parts of the building constituted damage to Manpower's insured property.

[4] ISOP brings an alternative motion to bifurcate any trial on bad faith from the trial on the amount of Manpower's damages for breach of contract. Because ISOP's motion for summary judgment as to bad faith will be granted, ISOP's alternative motion to bifurcate will be denied as moot.

## C. Prejudgment Interest

ISOP also moves for summary judgment on Manpower's demand for prejudgment interest pursuant to Wisconsin Statute § 628.46, which provides that when an insurer fails to pay a claim within the time specified in the statute, it is liable for interest at the rate of 12% per year unless the insurer has "reasonable proof" that it is not responsible for the claim. The parties agree that the "reasonable proof" standard under § 628.46 is equivalent to the "fairly debatable" standard used in evaluating bad faith claims. See Kontowicz v. Am. Standard Ins. Co., 290 Wis. 2d 302, 327-28 (2006); Allstate Ins. Co. v. Konicki, 186 Wis. 2d 140, 160 (Ct. App. 1994). As explained above, Manpower's claim for insurance benefits was fairly debatable, and therefore ISOP is not liable for statutory prejudgment interest.

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that plaintiff's motion for summary judgment regarding defendant's fraud claims is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment regarding plaintiff's bad faith claim is **GRANTED**. Defendant's alternative motion to bifurcate the bad faith and damages portion of the trial is **DENIED** as **MOOT**.

**FINALLY, IT IS ORDERED** that defendant's motion for summary judgment regarding plaintiff's claim for statutory prejudgment interest is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 24 day of September, 2010.

/s_____
LYNN ADELMAN
District Judge