# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MANPOWER INC.,**
         **Plaintiff,**

    v.                                                 Case No. 08C0085

**INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA,**
         **Defendant.**

---

## DECISION AND ORDER

In this insurance-coverage action, plaintiff Manpower Inc. ("Manpower") is seeking, among other things, coverage for a business-interruption loss from its insurer, The Insurance Company of the State of Pennsylvania ("ISOP"). The loss followed the partial collapse of a building in Paris, France, in which Manpower's French subsidiary, Right Management ("Right"), maintained an office. In a prior decision, I granted ISOP's motion to exclude the opinion of Manpower's forensic accounting expert, Eric Sullivan, as to the amount of Manpower's business-interruption loss, on the ground that Sullivan's opinions were not the product of reliable principles and methods. See Fed. R. Evid. 702. Manpower has moved for reconsideration of this decision. In discussing Manpower's motion, I assume familiarity with my prior decision. (Dec. & Order of Sep. 20, 2010 [Docket # 132].)

      Determining the amount of Manpower's business-interruption loss involves determining the profits that Right lost during the 14-month interruption period (July 2006 to August 2007). Sullivan's overall approach to calculating lost profits was to determine the profits Right would have earned during the interruption period but for the collapse by

extrapolating from Right's experience before the collapse. Essentially, Sullivan applied what is known as the "before and after method." Under this method, the expert compares the revenues and profits of a business before and after an event – in this case the partial collapse of Right's office building – and expresses the amount of the loss as the difference between the before and after levels. Patrick A. Gaughan, <u>Measuring Business Interruption Losses and Other Commercial Damages</u> 45 (2004). The analysis requires the expert to project the revenues that the business lost during the interruption period and apply a profit margin to the projected lost revenues. <u>Id.</u> at 139. To project Right's lost revenues, Sullivan used a method involving growth-rate extrapolation. Under this method, the expert first selects an appropriate revenue base from the "before" data. The base might be the revenues that the business earned during the year before the interruption or an average of the revenues the business earned over prior years, such as the past three years. <u>Id.</u> at 145. The expert then determines a growth rate and applies it to the chosen revenues to determine "but for" revenues. <u>Id.</u> The growth rate reflects the expected increase (or decrease) in the revenue stream over the relevant period. Thus, if the business's revenues had been growing at the rate of 5% per year for a number of years before the event, the expert might project that revenues would have continued to grow by 5% per year but for the event.

    In my prior order, I determined that Sullivan's use of the before-and-after method and his decision to use basic growth-rate extrapolation was reliable. However, I took issue with his decision to project lost revenues based on a five-month revenue base (January to May 2006) and a growth rate of 7.76% (calculated by comparing actual revenues from January to May 2006 to actual revenues from January to May 2005). As ISOP pointed out,

2

data for the period 2003 to 2006 showed that Right's growth rate was negative. ISOP pointed to other data showing that growth rates based on other periods would have been lower than Sullivan projected. The only reason Sullivan offered for choosing the period and growth rate he did was that Manpower had recently made changes at Right that seemed to have improved the company's performance, as reflected by the 7.76% growth rate for the five-month period preceding the collapse. Sullivan stated that he talked with Right's managers about the changes they made at the company and concluded from these conversations that the 7.76% growth rate would have continued throughout the interruption period but for the collapse. I concluded that Sullivan's conversation with Right's managers was not a reliable basis for his selection of a growth rate.[1]

In its motion for reconsideration, Manpower argues that Sullivan did more than rely on his conversations with Right's managers. In addition, Sullivan compared the 7.76% growth rate to growth rates based on other time periods. For instance, the growth rate based on a 12-month period would have been 20.1%. Using a 14-month period (the same amount of time as the loss period), the rate would have been 13.67%. A 2-year period would have yielded a growth rate of 11.27%. Other periods would have resulted in growth rates as low as –42.65% and as high as 175.76%. Manpower states that after reviewing the list of all possible growth rates, Sullivan exercised his judgment in determining that 7.76% was the appropriate choice.

The problem with this line of argument is that neither Manpower nor Sullivan demonstrates that compiling a list of possible growth rates and then choosing a rate from

---

[1] I explained why Sullivan's conversation with Right's managers was not a reliable basis for his opinions in my prior opinion and will not repeat that explanation here.

this list is an acceptable way to choose a growth rate in the field of forensic accounting. To offer an opinion under Rule 702, an expert must satisfy the court that his or her opinion is guided by principles and methods that are regularly applied by others in the relevant field. Zenith Elecs. Corp. v. WH-TV Broad. Corp., 395 F.3d 416, 419 (7th Cir. 2005) (experts must "follow scientific approaches normal to their disciplines"). In the present case, Manpower and Sullivan do not point to literature from the field of forensic accounting identifying the principles that a forensic accountant should apply when choosing a growth rate. Although Sullivan repeatedly refers to his "judgment" and the fact that this is how he has been calculating business-interruption losses over the course of his career, that is not good enough. It's what's normal in the field of forensic accounting that matters, not what Sullivan normally does.[2]

In any event, the method that Sullivan employed seems to rely on little more than Sullivan's own intuition, which is insufficient. Zenith, 395 F.3d at 418 (expert's "intuition" not a sufficient basis for opinion). As noted, Sullivan compiled a list of possible growth rates and then picked the one that looked about right to him. (Sullivan Dep. [Docket #138-2] at 74:17 – 74:24.) Although Sullivan states that he picked the "second most conservative" rate on the list (Sullivan Aff. [Docket #138-1] ¶ 10), there are two problems with this justification. First, Sullivan doesn't explain the principles that guided his selection

---

[2]Manpower points out that the Gaughan text explains that when a business has experienced both positive and negative growth – as Right has – the expert needs to apply judgment in selecting the appropriate growth rate. Gaughan, supra, at 145. Although it is no doubt true that the expert must exercise some amount of judgment, my point is that in exercising his judgment, the expert must be guided by principles normally applied in the field. Sullivan's analysis is insufficient because he does not explain the principles he applied when exercising his judgment or show that those principles are regularly applied by others in the field of forensic accounting.

of growth rates for inclusion on the list. (The list is on the second page of Schedule 6, attached to Sullivan's affidavit.) The list comprises growth rates calculated by comparing various monthly periods during the two years prior to the collapse (e.g., comparing June 2005–May 2006 to June 2004–May 2005), but Sullivan doesn't explain why this is the appropriate universe of possibilities. Moreover, as ISOP points out, Sullivan could have added many other possibilities to his list, some of which showed negative growth. Although Sullivan gives reasons for excluding some of these possibilities,[3] he points to no comprehensive method that guided his selection of relevant rates. Thus, even if Sullivan picked a conservative rate from his list, the list itself might have been inappropriately skewed towards higher rates. The second problem with Sullivan's justification is that he doesn't explain why picking the "second most conservative" rate from any list was an appropriate choice. Why not pick the most conservative rate, or the average of all rates? Again, Sullivan doesn't point to the principles of forensic accounting he applied when making this choice, and so I cannot conclude that his choice was the product of reliable principles and methods.

Manpower asks that if I decide not to reconsider my exclusion of Sullivan's opinion I give it an opportunity to submit a supplemental expert report as to Right's business-interruption loss. However, Manpower has already had a full and fair opportunity to offer expert testimony on this issue, and I am aware of no authority permitting an expert report to be supplemented as a result of a successful motion to exclude the expert's original

---

[3]Although Sullivan gives reasons for excluding certain rates, he still fails to show that those reasons are based on relevant principles of forensic accounting. Instead, he cites "my judgment." (E.g., Sullivan Aff. [Docket #138-1] ¶¶ 12-13.)

opinion. Manpower also asks for a <u>Daubert</u> hearing so that Sullivan can explain his analysis in more detail. However, Sullivan has already had four opportunities to explain the basis for his opinions – in his report, at his deposition, in an affidavit submitted in opposition to ISOP's motion to exclude his testimony, and in an affidavit submitted in support of Manpower's motion for reconsideration. A fifth opportunity is not warranted.

**THEREFORE, IT IS ORDERED** that Manpower's motion for reconsideration is **DENIED**.

Dated at Milwaukee, Wisconsin, this 11th day of April, 2011.

/s_____
LYNN ADELMAN
District Judge